**Case No. 24-1103**

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

LESLEE SCALLON, a California resident individually and derivatively on behalf of HENRY ENTERPRISES INC. and JAY GAIRSON, a Washington resident, individually and derivatively on behalf of HENRY ENTERPRISES INC.,

Plaintiffs - Appellees,

v.

SCOTT HENRY'S WINERY CORP., an Oregon corporation; CALVIN SCOTT HENRY III, and SYNTHIA BEAVERS.

Defendants - Appellants,

SHERRY KEARNEY, an Oregon resident, et al.

Defendants.

_____

On appeal from the U.S. District Court for the District of Oregon
Honorable Michael J. McShane, District Judge
Case No. 6:14-cv-01990-MC

_____

**OPENING BRIEF OF SCOTT HENRY'S WINERY CORP.,
CALVIN HENRY, III, AND SYNTHIA BEAVERS**

_____

William A. Drew, OSB No. 952539
Joel P. Leonard, OSB No. 960810
ELLIOTT OSTRANDER & PRESTON, P.C.
707 SW Washington Street, Suite 1500
Portland, OR 97205
(503) 224-7112
_Attorneys for Scott Henry's Winery Corp., Calvin Henry, III, and Synthia Beavers -
Appellants_

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................... 1

JURISDICTIONAL STATEMENT ............................................................ 1

ISSUES PRESENTED FOR REVIEW ...................................................... 1

ADDENDUM STATEMENT .................................................................... 3

STATEMENT OF THE CASE................................................................... 3

    A.   Introduction. ................................................................................. 3

    B.   The Parties to the Appeal. ............................................................ 6

    C.   How did we get here? ................................................................... 6

        1.   The Complaint, HEI's Election, and the First Appeal. ......................... 6

        2.   Remand, Appointment of the Evaluator, and the Appraisal. ............... 9

        3.   Settlement Talks. ..................................................................... 10

        4.   "Trial Briefs" leading up to the Fair Value Hearing. .......................... 10

        5.   The Fair Value Hearing and Opinion. ................................................. 16

        6.   The Settlement Negotiations Veer 180 Degrees from a Buyout of Plaintiffs. .................................................................... 18

        7.   The March 30, 2023 Status Conference. ............................................ 18

        8.   The "Presentment of Remedies." ....................................................... 20

        9.   The District Court's "Remedy" of the Underlying "Stayed" Claims. 21

        10. The District Court's Assessment of Attorney Fees for failing to Resolve Claims not before the Court. ................................................. 24

11. In denying the stay pending appeal, the District Court summarized its position with respect to the stay, and its plenary authority. ................ 27

SUMMARY OF ARGUMENT ................................................................ 28

STANDARD OF REVIEW ................................................................... 29

ARGUMENT ...................................................................................... 29

A. The District Court misinterpreted O.R.S. § 60.952(6) to permit it to remedy Plaintiffs' underlying oppression claims under O.R.S. § 60.952(2) instead of completing the statutory election to purchase under O.R.S. § 60.952(5). ...................................................................... 29

1. O.R.S. § 60.952(2) provides broad equitable authority to resolve oppression claims identified in O.R.S. § 60.952(1). .......................... 30

2. O.R.S. § 60.952(6) provides a legislative alternative to litigating oppression claims, in the form of a purchase election. ...................... 31

3. After an election, O.R.S. § 60.952(6)(f) allows a stay on all O.R.S. § 60.952(1) oppression claims, to determine the fair value and payment terms under O.R.S. § 60.952(5). ......................................................... 32

4. The legislature balanced the advantages and disadvantages of the purchase election, and provided an incentive for shareholders to resolve their disputes in some way other than a proceeding under subsection (1). ....................................................................................... 33

5. The legislature distinguished between the broad equitable powers provided to the court to resolve an oppression claim, and the narrower powers provided to determine a fair share value and enforce the purchase election. .................................................................................. 35

6. O.R.S. § 60.952(6)(d) does not confer unfettered authority to resolve an O.R.S. § 60.952(6) election with O.R.S. § 60.952(2) remedies..... 37

7. The O.R.S. § 60.952(6) "shortcut" is the law of this case. ................ 39

B. The District Court erred by punishing Appellants for not settling stayed claims, through the assessment of damages and attorney fees ................ 40

1. It was error to punish Appellants for not resolving stayed claims...... 40

2. Fees were not available to anyone under the statute, or complaint..... 42

3. The Court's Sanction under Lu was error. .......................................... 42

C. This Court should require reassignment of this case on remand. ............ 45

CONCLUSION .................................................................................................. 49

CERTIFICATE OF RELATED CASES ...................................................... 51

BRIEF FORMAT CERTIFICATION .......................................................... 52

ADDENDUM ...................................................................................................... 53

O.R.S. § 60.952 ......................................................................................... 53

CERTIFICATE OF SERVICE ...................................................................... 61

## TABLE OF AUTHORITIES

**Federal Cases**                                                      **Page(s)**

*Andreiu v. Ashcroft,*
   253 F.3d 477 (9th Cir. 2001) ................................................. 33

*Askins v. United States Dep't of Homeland Sec.,*
   899 F.3d 1035 (9th Cir. 2018) ............................................... 39

*California v. Montrose Chem. Corp.,*
   104 F.3d 1507 (9th Cir. 1997) ............................................... 46

*Chambers v. NASCO, Inc.,*
   501 U.S. 32, 111 S. Ct. 2123 (1991) .................................... 43

*Davies v. Grossmont Union High Sch. Dist.,*
   930 F.2d 1390 (9th Cir. 1991) ............................................... 40

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.,*
   778 F.3d 1059 (9th Cir.) ........................................................ 29

*Goodyear Tire & Rubber Co. v. Haeger,*
   581 U.S. 101 (2017) ........................................... 26, 42-43, 43

*Hanna Boys Center v. Miller,*
   853 F.2d 682 (9th Cir. 1988) ................................................. 39

*Hemmings v. Tidyman's Inc.,*
   285 F.3d 1174 (9th Cir. 2002) ......................................... 29, 34

*Kirkland v. Legion Ins. Co.,*
   343 F.3d 1135 (9th Cir. 2003) ............................................... 40

*Lind v. Wabash R. Co.,*
   370 U.S. 626, 82 S. Ct. 1386 (1962) .................................... 42

*Lu v. United States,*
   921 F.3d 850 (9th Cir. 2019) ......................... 26, 27, 43, 44

*Musacchio v. United States,*
   136 S. Ct. 709, 193 L. Ed. 2d 639 (2016) ........................... 39

*New Hampshire v. Maine,*
   532 U.S. 742, 121 S. Ct. 1808 (2001) .................................. 31

*Powell v. Rasmussen*,
No. 22-35361, No. 22-35362, 2023 U.S. App. LEXIS 23094 (9th Cir. Aug. 31, 2023) ........................................................................................ 34

*Rhoades v. Avon Prods.*,
504 F.3d 1151 (9th Cir. 2007) ...................................................... 47, 48

*Rissetto v. Plumbers & Steamfitters Local 343*,
94 F.3d 597 (9th Cir. 1996) ................................................................ 31

*Scallon v. Scott Henry's Winery Corp.*,
686 F. App'x 495 (9th Cir. 2017) ................................................. *passim*

*United Nat'l Ins. Co. v. R & D Latex Corp.*,
141 F.3d 916 (9th Cir. 1998) ................................................... 46, 47, 48

*WD Equip., L.L.C. v. Cowen (In re* Cowen*)*,
849 F.3d 943 (10th Cir. 2017) ........................................................... 33

**Federal Statutes**

28 U.S.C. § 1291 ....................................................................................... 1
28 U.S.C. § 1332 ....................................................................................... 1
28 U.S.C. § 2106 ..................................................................................... 45

**State Cases**

*Gearin v. Fleckenstein*,
89 Or. 146, 173 P. 569 (1918) ........................................................... 33

*Graydog Internet, Inc. v. Giller*,
362 Or. 177, 406 P.3d 45 (2017) ..................................... 29, 34, 35, 4

*Hampton Tree Farms v. Jewett*,
320 Or. 599, 892 P.2d 683 (1995) .................................................... 31

**State Statutes**

O.R.S. § 60.265 ...................................................................................... 55
O.R.S. § 60.391 ...................................................................................... 21
O.R.S. § 60.952 ............................................................................... *passim*
O.R.S. § 60.952(5) ...................................................................... 15, 17, 36

O.R.S. § 60.952(5)(a)(C) ................................................ 36

O.R.S. § 60.952(5)(a)(E) ................................................ 36

O.R.S. § 60.952(5)(c) ................................................ 36

O.R.S. § 60.952(5)(e) ................................................ 36

O.R.S. § 60.952(6)(a) ................................................ 17

O.R.S. § 60.952(6)(d) ................................................ 17, 36

O.R.S. § 60.952(6)(f) ................................................ 2, 35, 7

O.R.S. § 174.010 ................................................ 11

O.R.S. § 60.952(2) ................................................ 2

O.R.S. §§ 60.952(5)(a)(B) & (C) ................................................ 20

**Rules**

9th Cir. R. 28.26 ................................................ 51

9th Cir. R. 32 ................................................ 52

Fed. R. App. P. 26.1 ................................................ 1

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, appellant Scott Henry's Winery Corporation (the "Henry Winery"), by and through its undersigned counsel, hereby makes the following disclosures:

1.      The Henry Winery is a closely-held private Oregon corporation without a parent corporation.

2.      No publicly held corporation owns 10% or more of the Henry Winery's stock.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction pursuant to 28 U.S.C. § 1332. On January 25, 2024, the District Court entered a final general judgment against the Henry Winery, Calvin "Scott" Henry III, and Synthia Beavers (collectively, "Appellants" or the "SH Defendants"). 1-ER-6-8. Appellants timely filed their notice of appeal on February 21, 2024. 3-ER-419-420. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

When this case previously came before the Ninth Circuit, this Court held that O.R.S. § 60.952(6) applied to the derivative action claims filed by Plaintiffs – Appellees ("Plaintiffs"), and that the corporation, Henry Enterprises, Inc. ("HEI") properly elected to purchase the Plaintiffs' shares in HEI, pursuant to O.R.S. § 60.952(6), as a valid exercise of its right "to shortcut litigation by purchasing the

2

plaintiff's shares for fair value." *Scallon v. Scott Henry's Winery Corp.*, 686 F. App'x 495 (9th Cir. 2017) (unpublished) ("Scallon I"). This Court further held "the legislature wanted the provision [O.R.S. § 60.952(6)] to be used to end costly litigation early." *Scallon*, 686 F. App'x at 496. On remand, the District Court properly continued the stay on the underlying claims, pursuant to O.R.S. § 60.952(6)(f), and began to determine the "fair value" of the Plaintiffs' shares but failed to complete the purchase.

### Question No. 1

Did the District Court err when it interpreted O.R.S. § 60.952(6) to give it "unfettered discretion," to entertain and impose any remedy on Appellants, including O.R.S. § 60.952(2) remedies, for the stayed underlying claims?

### Question No. 2

When all that remained under O.R.S. § 60.952(5) was to decide payment terms for the purchase of Plaintiffs' shares, and to order the sale, was it error for the District Court to *sua sponte* "set aside" HEI's election to purchase the Plaintiffs' shares, and without a trial to immediately render judgment against Appellants on "stayed" claims, "extinguishing" their HEI shares to pay alleged debts and attorney fees, because they failed to *settle* the *stayed claims alleged against them* while the purchase election proceeded?

### Question No. 3

Was it error for the District Court to award attorney fees to Plaintiffs on a common fund theory, after their derivative claims were stayed, but erroneously adjudicated in violation of the stay and to assess fees against Appellants for bad faith abuse of the judicial process?

## Question No. 4.

After the District Court has twice entered erroneous orders to avoid completing the share purchase election option elected by HEI nearly 10 years ago, should this case be reassigned on remand to a different District Judge?

Appellants seek reversal of the District Court's Orders (1-ER-9-22), and

Judgment (1-ER-6-8) of the District Court, and a remand for the sole purpose of

completing the election to purchase Plaintiffs' shares for the determined "fair value"

on fair payment terms.

Appellants further seek an order reassigning this case on remand to a different

District Court judge, due to the many misplaced, almost personal, rebukes toward

Appellants, for their failure to "settle" the *stayed* claims, and the current judge's

clearly expressed opinion that he is empowered to achieve an "ultimate remedy"

against Appellants, even if it means adjudicating stayed claims that are outside of his

statutory authority.

## ADDENDUM STATEMENT

The Oregon statute cited in this brief, O.R.S. § 60.952, appears in an

addendum.

## STATEMENT OF THE CASE

### A. Introduction.

Appellants recognize that after almost a decade of litigation, there is a lot of

written material from which to argue. Some facts and arguments are material to the

4

O.R.S. § 60.952(5) purchase election process, and others are collateral which leads to the question, "which are which?"

The answer resides in the statute, O.R.S. § 60.952, as interpreted by Oregon's highest court in Graydog *Internet, Inc. v. Giller*, 362 Or. 177, 406 P.3d 45 (2017). But there is a fundamental disagreement between Appellants and the District Court as to the court's statutory role *after an election to purchase is made under O.R.S. § 60.952(6)*, and therefore disagreement about what facts are central, and what are collateral to the purchase election process.

Plaintiffs and the District Court argued that the Court's powers during the election were unlimited. The District Court's opinions, orders and the judgment entered below stem from its (erroneous) belief that the Court had broad and "unfettered" discretion to adjudicate, and to remedy stayed underlying oppression claims during the O.R.S. § 60.952(5) share valuation and purchase process. Based on this misunderstanding, the District Court engaged in a long and unauthorized detour to adjudicate the merits of *collateral* "stayed" claims, without a proper trial. The District Court then rendered judgments on the *stayed* claims and assessed attorney fees against Appellants through the forced "extinguishment" of Appellants' shares in HEI.

By contrast, Appellants (and HEI and this Court in the *Scallon I* appeal) followed the purchase election statute, O.R.S. § 60.952(6), to "shortcut" the oppression litigation, and to resolve the case without litigation on the merits of the

5

underlying claims. *Graydog*, 362 Or. at 198. That is the law of the case. *See Scallon*, 686 F. App'x at 495-96 ("The legislature wanted the provision to be used to end costly litigation early."). Appellants maintain that O.R.S. § 60.952(6) and O.R.S. § 60.952(5) *limit* the Court's authority in the purchase election process to those matters enumerated in subsections (5) and (6). While a court must still "tak[e] into account any impact on the value of the shares resulting from the actions giving rise to [the] proceeding," O.R.S. § 60.952(5)(a)(A), it is not empowered to litigate those claims, or to adjudicate them for the Plaintiffs or HEI, however acrimonious or inequitable the claims may appear.

This sharp contrast in interpretations of O.R.S. § 60.952 informs what Appellants and Appellees will include in their statements of the case. Appellants cite the places in the record where Plaintiffs and the District Court erroneously argued, interpreted or applied O.R.S. § 60.952, together with Appellants' preserved objections Appellants also cite the points in the record where HEI contradicted its current position in filings to this Court. By contrast, Plaintiffs will emphasize the District Court's collateral "findings" on the merits of the *stayed* oppression claims and will argue that such "inequity" demands a remedy.

The answer to that demand for a remedy, of course, is that, while imperfect, the legislature created the election remedy because it was better than the *protracted harm* that litigation of shareholder oppression claims can cause to an institution and a family, especially over time. *Graydog*, 362 Or. at 198. The protracted harm of this

litigation demonstrates the cost of the District Court's delay and denial of that election.

**B. The Parties to the Appeal.**

HEI is a closely held Oregon corporation owned by three groups of an extended family. 3‑ER‑396‑397. Plaintiffs Leslee Scallon and Jay Gairson are minority shareholders, collectively owning 5.51% of HEI. (*Id.*) Defendants-Appellants Calvin Scott Henry III ("Scott Henry" or "Scott") (now succeeded in death by the Calvin Scott Henry III Trust) (2-ER-62-63) and Synthia Beavers (aka "Syndi" or "Syndi Beavers") were also minority shareholders of HEI until judgment was issued below. Scott Henry owned 31.05%, and Syndi Beavers owned .74% of HEI's shares. 3‑ER‑396‑397. The Henry Winery was wholly owned by Scott Henry. *Id.*

**C. How did we get here?**

**1. The Complaint, HEI's Election, and the First Appeal.**

This case was filed December 12, 2014, as a shareholder derivative action. 3-ER-418.[1] On March 11, 2015, HEI elected to purchase Plaintiffs' shares for fair value under O.R.S. § 60.952(6).[2] 3-ER-393-394. On April 14, 2015, HEI filed a

---

[1] The complaint was amended on January 8, 2015. 3-ER-395-417.

[2] All defendants supported HEI's election. Defendant Sherry Kearney moved the HEI board to make the election, Defendant David Henry seconded the motion, which passed unanimously. Scott Henry was absent. 2-ER-84-86. Defendants David Henry, Christina Kruse and Sherry Kearney later filed a supplemental memorandum in support of the election. 3-ER-379-385.

7

"Motion [to] Stay All Claims and Proceed with Determining Price and Terms of Election to Purchase Plaintiffs' Shares." 3-ER-386-392. The District Court *denied* the motion to stay on the grounds that: (1) O.R.S. § 60.952(6) did not apply to derivative lawsuits, and (2) to apply O.R.S. § 60.952(6) to Plaintiffs' claims would deny them a right to a jury trial. 3-ER-366-378. HEI appealed the order denying the stay to this Court. Scott Henry played no part in the decision to make the election or pursue the appeal. 2-ER-84-90.

On appeal, HEI successfully argued that: (1) O.R.S. § 60.952 applied to derivative shareholder claims like this one, (2) O.R.S. § 60.952(6) short cut the oppression litigation through a "fair value" buy out of the Plaintiffs' shares, and (3) the election created no constitutional problems, because the legislature could eliminate Plaintiffs' claims by statute, along with their right to a jury.[3] 3-ER-360.

HEI successfully argued that "Oregon's legislature has given the members of a closely held corporation a cost-effective way to avoid protracted litigation. Rather than burning through the company's assets in a lawsuit, O.R.S. § 60.952 allows the defendant shareholders to shortcut litigation by buying the Plaintiffs' shares at fair value." 3-ER-358-359. Further, "Once the corporation or its shareholders exercise that right, as HEI did here, there is no longer any 'claim to which a right to a jury

---

[3]    HEI's successful arguments on appeal are relevant to this appeal because HEI is judicially estopped from changing its positions after arguing them successfully to its benefit. *See infra*, 32-34. Plaintiffs are bound by the holdings as Law of the Case. *See infra*, 40-41.

trial can attach.'" 3-ER-364. And, "The legislature is free to eliminate a cause of action – here, by allowing HEI to *terminate the litigation* by purchasing Plaintiffs' shares – without implicating the right to a jury trial." 3-ER-360 (emphasis added).

HEI also argued that, because the valuation process was not the same as "full blown litigation" on the merits, it would be streamlined. The following oral exchange occurred before this Court:

> Judge Leavy: "Now on valuation, somebody has to decide whether or not this case has any merit as it effects a value.
>
> HEI Attorney: "Yes.
>
> Judge Leavy: "And, uh so it's like uh, almost like a- a malpractice case where you have to decide the merits of the underlying case. And uh-
>
> HEI: "-yes-
>
> Judge Leavy: "-have to decide the merits of this and then move on to value- as a part of the valuation- so somebody has to decide whether or not you'd win or lose this case before they can know how much the shares are worth right?
>
> HEI: "It is kind of a case within a case, yeah, it's a little like a malpractice case it seems.
>
> Judge Leavy: "And that's all judge-work instead of jury-work.
>
> HEI: "Exactly. Yes.
>
> * * * *
>
> Judge Friedland: "So is this any easier? I mean you said it's a streamlined procedure, but is it basically just the same procedures that would happen anyways?

9

HEI: "Well yeah, if you have a full-blown litigation, you know, you're going to have discovery and, uh, discovery disputes, and motion practice, summary judgment- all that stuff that, you know, as for the expense. But here you just go back to the trial judge and he's going to hear some testimony from the witnesses about what their complaints were, and he'll just wrap that into the, the valuation. So, it is- It's far more streamlined."

*See*, Ninth Cir. Oral Arg. Archives, at https://www.ca9.uscourts.gov/media/video/?20170310/15-35952/.

On April 11, 2017, this Court issued its opinion. 2-ER-352-355. This Court reversed the order denying HEI's request for an O.R.S. § 60.952(6)(f) stay to complete HEI's purchase election and remanded for further proceedings. 2-ER-352-355. The only thing left to do was to complete that election under O.R.S. § 60.952(5).

### 2. Remand, Appointment of the Evaluator, and the Appraisal.

Following this Court's reversal, the District Court began the O.R.S. § 60.952(5) share valuation by appointing an "evaluator", who completed his report on April 21, 2021. 2-ER-351. The report calculated the value of Plaintiffs' shares (not including the value of the disputed claims) as of December 11, 2014, as required by O.R.S. § 60.952(6)(f).

By this point, nearly seven years had passed since HEI's election to purchase the Plaintiffs' shares. The underlying claims remained stayed. After the evaluator filed his report, the District Court set the fair value hearing on January 24, 2022. 2-ER-349.

### 3. Settlement Talks.

The parties agreed to mediate the share purchase price and terms starting on July 19, 2021.  In October/November of 2021, the mediator proposed a settlement with a total purchase price for Plaintiffs' shares. Appellants and Plaintiffs agreed.  2-ER-96-97.  HEI and other co-defendants rejected the mediator's proposal.[4]  *Id.*

By 2021, HEI's settlement positions began to contradict its longtime legal positions.  Instead of completing the purchase of Plaintiffs' shares and dismissing the lawsuit, HEI and some of its shareholders newly insisted upon payment of the stayed underlying claims as a condition to any agreement on the purchase price or terms for the purchase of Plaintiffs' shares.  Settlement talks continued but failed.[5]

### 4. "Trial Briefs" leading up to the Fair Value Hearing.

During the lead up to the January 2022 fair value hearing, the parties each filed

---

[4]     Had HEI and the other shareholders agreed to the mediator's proposal (without additional conditions), the purchase election could have been completed in November of 2021, with a purchase of Plaintiffs' shares for an amount less than the $1,223,505.07 determined by the District Court after the "fair value" hearing (including interest). 2-ER-97.

[5]     Some explanation is in order.  Much has been argued about Appellants' refusal to settle debts with HEI.  It wasn't that simple.  As everyone knew, Scott Henry's only means of payment to HEI was the sale of his stock to HEI, which required agreement with HEI and others as to the current price and terms, tax considerations, and how Scott Henry's remaining equity would be paid. Nonetheless, Scott Henry was willing, and offered many times, to exchange his shares for payment of debt, some amount of cash and some amount of property, while mindful of tax issues.  The parties simply couldn't agree on all components.  Plaintiffs, HEI and other shareholders blamed settlement failures on Scott, which aggravated the District Court.  But, in fact, Scott Henry provided plenty of evidence that he was actively seeking to settle the dispute.  2-ER-94-97, 126-181.

trial briefs with the District Court. In those briefs, Plaintiffs and HEI argued that the

District Court was empowered by O.R.S. § 60.952(6)(d) to *determine* the "stayed"

claims in the fair value hearing *and* to *order the payment* of those "stayed" claims as

part of the valuation of Plaintiffs' shares. Plaintiffs' wrote:

> "Resolution of the current proceeding is addressed under O.R.S.
> § 60.952 (6)(d):
>
> * * * *
>
> "By its plain terms, the proceeding filed against defendants is not
> automatically dismissed by virtue of the purchase of Plaintiffs' shares.
> Before any "discontinuance, settlement . . or other disposition" of the
> Court must determine the equitable resolution of that proceeding. * * *
> *. Certain Defendants attempt to insert limitations into O.R.S. § 60.952
> that are simply not there (automatic dismissal of proceeding upon
> purchase of Plaintiffs' shares) while ignoring those provision which are
> there (no discontinuance, settlement or other disposition unless
> equitable to corporation and shareholders). Those Defendants'
> interpretation of O.R.S. § 60.952 violates Oregon law and cannot be
> given any weight. O.R.S. § 174.010." 2-ER-343-344.

Plaintiffs urged the District Court to ignore the stay on "Subsection (1)" claims.

> "What is clear is that once a Subsection (1) proceeding has been
> filed, the Court has broad equitable and legal authority under
> Subsection (2) to fashion a remedy. Nothing within O.R.S. § 60.952
> says that once an election to purchase is made under Subsection (6)(f)
> that the Court is somehow stripped of its authority under Subsections
> (1), (2) and (3). Under O.R.S. § 60.952, the Court has the power to both:
> (a) order the purchase of Plaintiffs' shares for fair value as elected by
> HEI, and (b) resolve the claims against the defendants in a manner that
> is equitable to the corporation and other shareholders. Plaintiffs submit
> that under Subsection (2), the Court has broad authority, including
> among other things, the power to order an award of damages to HEI as
> an aggrieved party against various defendants for amounts shown at
> trial relative to the actions giving rise to this proceeding as resolution
> of those matters. 2-ER-345-346.

12

Appellants interpreted the statute differently:

> "There is nothing in the statute that provides or allows for the Court to actually litigate disputed claims between the company and its alleged debtors, render judgment against debtors, or to make any binding findings and conclusions, against any party other than the corporation (HEI), when it makes its December 11, 2014 "fair value" determination." 2-ER-335.

In its own trial brief, HEI reversed its earlier position, and argued that adjudication

and payment of the stayed claims was "required."

> "[I]n order to determine the value of HEI, it is necessary to adjudicate the existence and amount of the underlying obligations of the alleged bad actors to HEI and to require payment to HEI directly, before finally assessing the "fair value" of HEI's shares." 2-ER-323; *See also* 2-ER-330, ft nt 6.

Appellants quickly objected to HEI's surprise change of position:

> "HEI's delay in announcing its intentions raise concerns as to sandbagging. The Ninth Circuit remanded this case for a determination of 'fair value' on April 11, 2017. * * * * HEI filed numerous joint status reports with the Court, and none expressed its desire to 'adjudicate' third-party claims in the court trial. But with less than one month before the court trial on the 'fair value' of Plaintiffs' shares, HEI asserts (for the first time in any pleading) that it now must have an *adjudication* of all claims against Scott Henry and the Henry Winery *as part of its elected purchase*. That simply is not permitted by the Federal Rules of Civil Procedure.
>
> "HEI's sudden change in position came as a complete surprise to Scott Henry, Syndi Beavers and the Henry Winery, because, until now, they expected the "valuation hearing" to be, as HEI had always asserted, between Plaintiffs and HEI to determine the fair value of Plaintiffs' shares and the terms of purchase as between those two parties. No one moved to reopen the Plaintiffs' derivative claims. No one informed [Appellants] that they would be "on trial." No one informed [Appellants] that HEI had reversed its seven year position that the Plaintiffs' claims would naturally end as a result of HEI's election,

and would *not* need to be litigated at this trial." 2-ER-314-315.

Appellants further argued that HEI should be judicially estopped from its reversal, 2-ER-310-314.

Defendants David Henry, Christina Kruse and Sherry Kearney sided with HEI:

"David, Christina and Sherry agree with HEI's position that the most equitable approach for HEI (and its remaining shareholders) and Plaintiffs is to require the reimbursement of any obligations by a date certain, after which a money judgment in the amount of the obligation will result. Only after HEI is made whole (if the Court determines there are outstanding obligations), or it has a money judgment the collection of which would make it whole, can a fair and accurate adjustment to the evaluator's current value of $44.46 per share be made." 2-ER-307.

Appellants also moved to be excused or "dropped" from the fair value hearing, because it was being misused by Plaintiffs and HEI (at the last minute) to litigate "stayed" claims to a judgment against Scott Henry, who was by this point suffering from dementia, and incompetent to testify. 2-ER-334-339. Appellants wrote:

"* * * HEI's counsel has indicated that HEI seeks to use this action to secure some kind of judicial determination of enhanced value, together with "findings" that Defendant Scott Henry is liable for at least the booked value of alleged loans and rent due from Scott Henry and/or the Winery. In other words, HEI seeks a ruling on collateral claims that it can later use against the SH Defendants, without actually filing or litigating any claims, to advance the interests of the non-SH Defendants (who now control HEI) against the SH Defendants.

"* * * * *

"* * * * *. The Court should not be party to, or facilitate efforts of Defendants HEI, Sherry Kearney, William David Henry, or Christina Kruse to secure legal rights, or to pursue their ulterior motives vis-à-vis the SH Defendants, which are entirely outside the single remaining issue before the Court for decision in this action." 2-ER-339-340.

14

Less than two weeks before the fair value hearing, the District Court denied Appellants' motion to drop or sever.  1-ER-55-60. In that order, it acknowledged that, by HEI's election, HEI had "concluded that, *rather than litigate the Plaintiffs' claims*, it would simply buy out Plaintiffs' shares under ORS 60.952(6)."  1-ER-56. (emphasis added).  The Court also "noted" that the "underlying claims against the SH Defendants are *stayed*, not dismissed."  1-ER-57 (emphasis added).  But then the Court expressly rejected Appellants' argument that, "it would be error for the Court to render additional judgments or make a finding of fact relating to present-day liability of any individual, or as to any of the disputed HEI assets," 1-ER-56, and adopted the position that O.R.S. § 60.952(5), "essentially gives the Court unfettered discretion" to fashion any equitable remedy. 1-ER-58.  The Court strung the broad equitable powers granted in subsections (2), (3) and (4) together with the limited references to equity in subsections (5) and (6) to conclude that "[t]he legislature clearly intended to allow a court to take whatever actions it felt necessary to achieve equity."  1-ER-59. We quote the District Court's misplaced interpretation of its O.R.S. § 60.952(5) duties at some length,

> "In case it is not clear as we head into trial, the buyout statute confers broad equitable powers upon the Court to 'determine the fair value and terms of purchase of the shares[.]' ORS 60.952(6)(f). As noted, the statute clearly directs the Court to 'tak[e] into account any impact on the value of the shares resulting from the actions' in the underlying complaint. ORS 60.952(5)(a)(A). And in fashioning an equitable remedy, the statute essentially gives the Court unfettered discretion.  For instance, the statute explicitly authorizes the Court to: cancel or alter the corporation's bylaws; remove any corporate director

15

or officer; appoint any individual as a director or officer; order an accounting with respect to any disputed matter; appoint a custodian to manage the corporation under terms prescribed by the Court; issue distributions; award damages 'to any aggrieved party;' order the corporation or any shareholder or shareholders to purchase shares of any other shareholders; retain jurisdiction to protect the shareholders who filed the underlying action; or dissolve the corporation. ORS 60.952(2). As if that was not enough, the statute expressly states that the remedies listed above 'shall not be exclusive of other legal or equitable remedies that the court may impose.' ORS 60.952(3).

"Additionally, after determining fair value, the statute again grants the Court essentially unfettered discretion in creating 'the terms of the purchase,' such as setting installment payments and interest rates, requiring security, and allowing 'subordination of the purchase obligation to the rights of the corporation's other creditors[.]' ORS 60.952(5)(a)(C). The Court may even order the dissolution of the corporation if necessary to enforce its order to purchase Plaintiffs' shares. ORS 60.952(5)(a)(E). The Court may even modify its purchase order 'if the court finds that the modifications are equitable.' ORS 60.952(5)(c). The legislature clearly intended to allow a court to take whatever actions it felt necessary to achieve equity.

"* * * * *.

"Although this is a somewhat unusual fact pattern, the broad wording of the statute appears to put the Court in position to put in place an equitable solution. For example:

"If the court orders shares to be purchased by one or more other shareholders, in allocating the shares to be purchased by the other shareholders, *unless equity requires otherwise*, the court shall attempt to preserve the existing distribution of voting rights and other designations, preferences, qualifications, limitations, restrictions and special or relative rights among the holders of the class or classes of shares and may direct that holders of a specific class or classes not participate in the purchase."

"ORS 60.952(5)(e)(emphasis added).

"In other words, if equity requires that the Court alter voting or any other corporate rights, the Court appears free to use its discretion to achieve an equitable outcome. Or, the Court could award damages 'to any aggrieved party.' ORS 60.952(2)(j). And should the Court determine the circumstances do not allow for a sufficient way to resolve the matters in dispute, the Court is free to order the dissolution of the corporation. ORS 60.952(2)(m)." 1-ER-58-60.

**5. The Fair Value Hearing and Opinion.**

A three-day "fair value" hearing was held on January 25-27, 2022. Defendant Scott Henry, who was then suffering from dementia, was not compelled to appear or testify. 2-ER-347 (granting protective order). At the hearing, Plaintiffs, HEI and the other Defendants agreed on the value of most, if not all, of the assets and underlying claims to be considered in setting a robust "fair value" of the Plaintiffs' shares.[6] Unable to put Scott Henry on trial, the other parties put Syndi Beavers, his daughter, on trial as his surrogate. She agreed that Scott Henry and the Winery, had historically owed debts to HEI.

The District Court issued its fair value opinion on June 15, 2022. 1-ER-39-54. In relevant part, the Court determined that Plaintiffs' shares were worth $858,600.17, plus interest at 5% per annum from December 11, 2014, for a total of $1,223,505.07 through June of 2023. Collaterally, the District Court harshly criticized the Appellants for failing to pay on the underlying stayed claims, but the Court stopped

---

[6]     In Scott Henry's absence, HEI and the other Defendants sought an enhanced valuation of the underlying claims against Scott Henry – so long as such enhanced value would be backed by a compelled payment, or judgment against Scott Henry and his shares. See 2-ER-307; 2-ER-329-330.

17

short of ordering the payment of claims, or fees:

> "The Court concludes that these arguments go beyond the scope of the fair value determination presently before the Court. The Court is merely tasked with formulating the fair value of Plaintiffs' shares as of the day before they filed the action. Additionally, the Court is tasked with ensuring an equitable buyout of those shares. While that is the limit of the Court's duties, as this case sounds in equity, the Court may consider any actions, by any parties, in considering the appropriate remedy when buying out Plaintiffs' shares." 1-ER-53.

The Court then "stayed" the proceedings for another 90 days "while the parties work toward an acceptable route forward." 1-ER-54. It warned,

> "if the parties remain unable to come to an agreement on the buyout, the Court will step in and, as noted at trial, use a much blunter instrument in crafting an appropriate remedy." *Id.*

At this point, the parties had three statutory paths to resolution of the case: (1) Follow the O.R.S. § 60.952(5) purchase election process, determine the terms of purchase, and complete the election; (2) move to set HEI's election aside under O.R.S. § 60.952(6)(a), and lift the stay to begin "full blown" litigation of the underlying claims (no one ever proposed this); or (3) settle out of court and obtain O.R.S. § 60.952(6)(d) approval of that settlement. But now the Court had opened a fourth, completely erroneous path for Plaintiffs and HEI: i.e., to *leverage* the Court's apparent willingness to decide the underlying claims against Appellants, *without lifting the stay*, to reach a more favorable settlement with Appellants.

18

**6. The Settlement Negotiations Veer 180 Degrees from a Buyout of Plaintiffs.**

Bolstered by the District Court's expression of its sweeping "equitable" powers, global settlement discussions took a 180-degree turn. Plaintiffs now proposed: To reverse the election and remain shareholders, to have HEI buy out Appellants, and to have HEI buy out codefendants David Henry and Christina Kruse, leaving Plaintiffs in control of HEI. While Plaintiffs' proposal was beyond anything that the District Court could award in an O.R.S. § 60.952(6) purchase election, Appellants were open, in principle, so long as they were fairly bought out. If not, then Appellants were content to continue with HEI's election to purchase Plaintiffs' shares. The record below reflects that Appellants delivered at least ten settlement proposals to Plaintiffs. 2-ER-125-181. Ultimately, all parties could not agree, and a global settlement was not reached.

**7. The March 30, 2023 Status Conference.**

On March 30, 2023, eight years after HEI's election to purchase, and 14 months after the fair value hearing, the District Court convened a status conference. 1-ER-25-38. At the conference, Appellants and Plaintiffs asked for the appointment of a judicial settlement judge to help finalize a settlement. Other counsel asserted that a settlement conference would be a waste of time because Appellants "weren't in alignment with the rest of the parties". Assuming that Appellants were to blame, the Court suggested several extrajudicial "remedies" to conclude the case.

19

"Let me throw out two ideas, and I'll have all of you tell me what you think. One is to simply submit your proposals regarding ultimate remedies to me. And I will either accept one that I think looks the wisest and most equitable, or I'll modify a number of them to reach my own conclusion on how we're going to ultimately conclude this case.

"The other option I was kicking around -- and I'm curious what you think -- is I simply appoint an arbitrator, and you would basically engage in binding arbitration. The reason I'm thinking of that -- there is a judge -- Senior Judge Bergstrom from Multnomah County -- who's been doing a lot of civil mediation, both in Multnomah County and in Lane County.

"And he is from a wine family -- the Bergstrom Vineyards -- well known for their pinot noirs. And he probably has a little bit of understanding of the pitfalls of entering into a winery with your family members. So he does have a little bit of background. He's not the winemaker, but he is part owner of the winery.

"But that would be -- you know -- I suppose that would give each side a little more opportunity to sit down and be heard in maybe more of a mediative style setting, but with the understanding he would basically recommend an ultimate decision that I would adopt, or you just come directly to me with your proposals." 1-ER-28-29.

Clearly, neither of these ideas were contemplated by the legislature in an

O.R.S. § 60.952(6) purchase election. When Appellants objected that the remedy

being considered by the parties was "180 degrees from what would happen in the

case if it were to go forward under the statute," the District Court replied that it was

not constrained by O.R.S. § 60.952(5).

"THE COURT: All right. Mr. Drew, what are your thoughts?

"MR. DREW: Thank you, Your Honor. The problem I see with submitting the, at least, current course of negotiations to you, and asking for an opinion, is that the negotiations have been completely outside of what would happen in the case if we were to go forward with the next hearing.

20

"You know, the case -- and I don't want to go too far, because all that we have talked about has been settlement negotiations. And those are -- you know -- have been an attempt to resolve, globally, the case, outside of the litigation. But -- and that's why I feel that settlement judge would be more appropriate than any mediator. I mean, if Judge Bergstrom is agreeable to people, that's -- that's fine with us too. But the current negotiations -- at least the way they were left off on Monday -- are 180 degrees from what would happen in the case if it were to go forward under -- under the statute.

"THE COURT: I think -- and we've had this discussion before. I think we just have a pretty different understanding of the Court's equitable powers in fashioning remedies in this case. And I'm convinced I have very, very broad equitable powers, including appointing a receiver and liquidating this entire corporation. And I know we disagree on that." 1-ER-30-31.

The Court then warned Appellants that they had 60 days to "compromise" or submit to its "ultimate remedy."

"And this doesn't prevent you from, between now and 60 days, you know, having a heart-to-heart talk with your clients and, you know, reaching out across the table and trying to negotiate your own settlement. *I have to say, from my perspective, this isn't going well for the [Scott Henry] Winery group, ultimately. And if there are some sticking points where they can compromise, this 60-day period would be the time to do it.*" 1-ER-16-17.

## 8. The "Presentment of Remedies."

Bolstered by the Court's harsh treatment of Appellants' objections to the "ultimate remedy" showcase, settlement became more difficult. On May 30, 2023, the parties presented their "remedies" to the Court. 2-ER 217-292. Appellants suggested reasonable payment terms for the purchase of Plaintiffs' shares, so that HEI's election could be completed. O.R.S. §§ 60.952(5)(a)(B) & (C). 2-ER-249-250. All other parties presented remedies beyond the scope of the Court's O.R.S. §

21

60.952(5) powers.  For example, Plaintiffs presented a remedy that set aside HEI's election to purchase their shares and ordered Appellants to pay all debts alleged in the "stayed" underlying claims, plus another claim that had never before been pleaded.[7]  Further, Plaintiffs' remedy required Appellants to sell their currently held shares in HEI at the 2014 price determined for HEI's election to purchase Plaintiffs' shares, without the seven years of interest that Plaintiffs would have allowed for themselves.  2-ER-277-78.  Defendants Kearney, William Henry and Kruse argued, "if Scott's debt can be resolved, all of the other shareholders have reached a global resolution to resolve the remaining issues in the case."  They submitted, "it is appropriate at this time for the Court to redeem Scott's shares to resolve his debt."  2-ER-287.  Ignoring its previous election, and the nearly 9 years everyone had spent working to complete the election, HEI declined to "take a position in the ultimate disposition of the case."  2-ER-292.

### 9. The District Court's "Remedy" of the Underlying "Stayed" Claims.

Without offering any opportunity for written responses to the presented

_____

[7]  Plaintiffs asked the Court to order Scott Henry to return $122,500 in attorneys fees that Plaintiffs said HEI had advanced to him as defense costs in this lawsuit, and that he agreed to repay "if I am ultimately determined not to have met the standard of conduct described above [in O.R.S. § 60.391]."  2-ER-254, 269.  But this claim had never appeared before.  It would have required adjudication of the stayed claims, as well as this extra contract claim.  It was not part of the valuation hearing, and Scott Henry was never tried for breach of the alleged agreement or given any opportunity to defend.  It made its first appearance in the final remedy proposed by Plaintiffs, 2-ER-277, yet was adopted by the Court.

22

"remedies", or a hearing, the District Court adopted the Plaintiffs' remedy and *decided* the stayed claims (and the new claim) against Appellants. In its Opinion and Order, the District Court harshly judged Appellants for failing to "settle up" on the underlying stayed claims with HEI. 1-ER-18-22.[8]

The District Court improperly granted Plaintiffs' remedy because Appellants did not *pay* the stayed claims (which had not been adjudicated) or *settle* all of the family's disputes to everyone's satisfaction. It wrote,

> "Given the actions of the Scott Henry Defendants throughout this litigation, the Court was not surprised to learn that the parties were unable to come to an agreement on any remedy or buyout. As the Court noted in the June 2022 Opinion, the Scott Henry Defendants neither disagreed with the amount of the debt nor attempt to resolve it. Rather than simply settle up, the Scott Henry Defendants forced the other parties to engage in expensive, unnecessary litigation. With the exception of the Scott Henry Defendants, every party to this action asks the Court to buyout not the Plaintiffs' shares in HEI, but to instead buyout Scott Henry's shares. Given the history of this litigation over the past decade, it is no surprise that the Scott Henry Defendants (1) ask the Court to order HEI to buyout Plaintiffs' shares and (2) include no provisions for assuring Scott Henry's debt is repaid. This is but the latest example of the Scott Henry Defendants attempts at avoiding paying what Scott Henry essentially stole from HEI. Given the unique circumstances present here, the Court agrees with the proposals recommending the Court order HEI to buyout Scott Henry's shares."

---

[8] We anticipate that Appellees will argue that Scott Henry incurred a significant debt decades ago, which was at the heart of the lawsuit. But the record before 2021 (seven years into the case) shows unanimity among defendants, who all supported the election to purchase Plaintiffs' shares. 2-ER-378-391. But the family eventually fell apart, and everyone turned against Scott Henry. Was it opportunism as Scott Henry's health failed? Was it some other "family issues" of the type that the statute was intended to avoid? Whatever the case, had the District Court expeditiously *completed* the purchase election after remand, this case would have been resolved years ago.

23

1-ER-19-20.

The District Court then went further, to "find" that Appellants should pay for

everyone's attorney fees, up to the value of their shares.  It wrote:

> "The Court agrees that the buyout must take into account that the essentially frivolous position taken by the Scott Henry Defendants unnecessarily caused HEI and the other individual parties to incur over $1,000,000 in fees and costs.  Those fees and costs must be factored into the buyout. After accounting for Scott Henry's debt, Scott Henry's remaining shares are valued at roughly $500,000. This amounts to nearly 1/3 of the fees the Scott Henry Defendants forced the other parties to needlessly incur over the past decade. This buyout is necessary because the Scott Henry Defendants have indicated they will take whatever steps are necessary to avoid paying their fair share. They will file state court actions against the other parties and attorneys. They will no doubt appeal the coming Judgment in this action. The only equitable outcome here is to incorporate Scott Henry's debt in the buyout, if for no other reason than it appears to be the only way to make sure that debt will be repaid. Simply buying out the Plaintiffs without also resolving Scott Henry's debt would admittedly be a great boon to the Scott Henry Defendants. However, such a result would be patently unfair to the other named Defendants. The Court explained its view of this action in its fair share order issued last year:

>> "The Scott Henry Defendants view HEI's role as protecting the Scott Henry Defendants over the other HEI shareholders. While wiping out the substantial debt would certainly result in a lower buyout of Plaintiffs' shares, the Scott Henry Defendants appear to not realize that the Passive Defendants would be similarly impacted. The only beneficiaries of the Scott Henry Defendants' strategy are the Scott Henry Defendants. This view, unsurprisingly, mirrors the view Scott Henry held as to HEI's assets over the past 40 years. But HEI has a duty to treat all shareholders equally. This is especially so in an action sounding in equity. The argument also ignores the fact, purposefully or not, that Plaintiffs are current shareholders in HEI. But seeing arguments like these merely confirms for the Court why this litigation is ongoing nearly a decade after being filed, despite the Scott Henry Defendants' acknowledgment of

24

the debt at issue and Mr. Gadawski's appraisal of HEI's undisputed assets. Having seen the full tab Scott Henry ran up, Scott Henry and Synthia Beavers are reluctant to be called to finally settle up."

"June 15, 2022 Op. and Order, 8 (footnote omitted).

"The Court now expressly finds that the Scott Henry Defendants decided to drive up the cost of this litigation in the hope doing so would persuade the other parties to allow the Scott Henry Defendants to keep the vineyard and winery as a condition of settlement. Given the Scott Henry Defendants' position during this litigation, equity demands that the Scott Henry Defendants are responsible, at least to the extent Scott Henry has shares to redeem, for the attorney fees incurred over the past decade." 1-ER-20-21.

The District Court immediately signed the Plaintiffs' proposed order (1-ER-14) which *sua sponte* ended the purchase election and immediately awarded damages and extraordinary relief to HEI and against Appellants on the stayed claims. That was error.

**10. The District Court's Assessment of Attorney Fees for failing to Resolve Claims not before the Court.**

As part of the Plaintiffs' proposed remedy (adopted by the District Court), the Court ordered all parties (except the Appellants), to submit fee statements for consideration by the Court. 1-ER-16. All parties (except Appellants) did so on or about August 24, 2023. Some of them claimed, without any supporting evidence, that Appellants, or various groups of them, somehow prolonged the *valuation* process by refusing to reasonably settle out of court. 2-ER-81, 204.

On August 30, 2023, Appellants filed their "response" to the requests for the

25

assessment of fees, 2-ER-84-202, arguing that the District Court lacked authority to award relief on the underlying claims because the stay had never been lifted. 2-ER-196-97. Appellants noted that none of the proposed attorney fee assessments against them specified any statute, rule or other grounds for an award of fees. *Id*. at 201. Finally, they pointed out that unsworn attorney statements provided by the other parties were not "evidence," and that the subjective conclusions of counsel were contradicted by written objective evidence of Appellants' good faith negotiations. 2-ER-198-201; 2-ER-94-181.

In response, Plaintiffs argued that O.R.S. § 60.952(6)(d) "obligat[ed] the Court to deal with the claims against Scott" despite the stay on those claims. 2-ER-66-67. They wrote:

> "The SH Defendants read the provision that the "proceeding" is "stayed" under ORS 60.952(6)(f) in a vacuum – ignoring the context and purpose of the statute as a whole as is required by Oregon courts when interpreting statutory provisions. Text cannot be read in isolation but must be considered in context of the statute, as a whole. While the "proceeding" brought under ORS 60.952(1) is stayed, the Court is charged under ORS 60.952(5)(a)(A) with determining the share value to be paid in a buyout by, among other things, "taking into account" the actions giving rise to the proceeding. The determination of share value necessarily involves consideration of the claims that gave rise to the proceeding. In this case, SH Defendants refused to stipulate to or account for the debt, which obligated the Court to hold a trial on the matter in order to "take into account" Scott's debt and determine the fair value of the shares.

> "SH Defendants then argue that because the original proceeding is stayed, the Court is essentially powerless to deal with SH Defendant's debt. Again, this ignores the text and context of ORS 60.952. Oregon Revised Statute 60.952(1) plainly provides that once a

26

> qualifying proceeding is filed (which this is), the Court has the broad authority granted to it under ORS 60.952(2) to resolve the dispute. Among other things, the Court has the statutory authority to: (a) set aside the purchase of Plaintiffs' shares, (b) order a purchase of any shareholder for fair value, not simply the Plaintiffs, and (c) exercise any other legal or equitable authority the Court has. The Court described in detail its broad "unfettered" authority to address Scott's debt in its prior opinions on the matter and Plaintiffs will not repeat those findings here." 2-ER-66-67 (citations omitted).

Plaintiffs then offered, for the first time, a sanctions theory on which the District Court should award fees against Appellants. 2-ER-67 (*citing Goodyear Tire & Rubber Co. v. Haeger, 58*1 U.S. 101 (2017) and *Lu v. United States*, 921 F.3d 850 (9th Cir. 2019)). Plaintiffs argued that fees could be shifted to Appellants in an "exceptional case" in which "entirety of the action is attributable to bad faith abuse of the judicial process," 2-ER-72, and where fees associated with the action "* * * would not have been incurred but for the bad faith conduct of a litigant." *Id.*; (*quoting Lu*, 921 F.3d at 860-861). Plaintiffs urged the Court to assess all fees incurred during HEI's fair value election process on (incapacitated) Scott Henry *and his daughter*, who were parties to *only* stayed claims.

On December 18, 2023, the District Court brushed aside Appellants' arguments and awarded fees against Appellants up to the remaining value of Appellants total shareholdings in HEI, after the underlying claims were paid. 1-ER-11 ("the Scott Henry Defendants rehash stale arguments in asking the Court to award no fees"). At that time, no claim against Appellants for fees was ever pleaded in a complaint, and no underlying claims were tried on the merits. No hearing was

27

offered on fees.  The District Court judge decided to take virtually everything that the

Appellants had (their shares in the family company), and to give it to HEI to end the

litigation *his way.*  Scott Henry lost his family's estate and was denied his 31%

interest in HEI, without a trial.  Syndi Beavers lost her shares in HEI without any

explanation, and without any opportunity to respond.  She was stripped of her shares

in HEI because, apparently, the entire case was her fault.  *Lu,* 921 F.3d at 850.  The

District Court judgment was punitive, misplaced and erroneous.

## 11. In denying the stay pending appeal, the District Court summarized its position with respect to the stay, and its plenary authority.

After entry of the judgment, Appellants moved for a stay of the judgment

entered in violation of the existing stay.  The District Court did not deny the

existence of the stay on the underlying claims against Appellants.  Rather, it chided

Appellants for attempting to "avoid settling up their debt to HEI," and for ignoring

"the vast equitable powers the Oregon legislature placed in courts' hands when

resolving shareholder disputes in closely held corporations like HEI."  It wrote:

> "Surprising no one, the Scott Henry Defendants now move, over the objections of all other parties, to stay that Judgment pending their appeal.  The Scott Henry Defendants regurgitate arguments this Court rejected on numerous prior instances over the past ten years. The Court understands the Scott Henry Defendants disagree with the Court's conclusions concerning the scope of remedies available in this action sounding in equity. *But the current motion to stay looks to be simply the latest attempt by the Scott Henry Defendants to avoid settling up their debt to HEI.*  The Scott Henry Defendants make only a half-hearted attempt at meeting their burden to demonstrate a stay is appropriate.

28

"Importantly, the Scott Henry Defendants demonstrate no likelihood of success on the merits of their appeal. As noted, the Scott Henry Defendants *merely argue that because the underlying claims against them were "stayed," the Court abused its authority in determining the Scott Henry Defendants owed HEI well over $1,000,000 before interest*. As they have done for the past several years, the Scott Henry Defendants choose to ignore the vast equitable powers the Oregon legislature placed in courts' hands when resolving shareholder disputes in closely held corporations like HEI." 1-ER-3

In fact, Appellants have never disputed the District Court's authority to consider and assign a *value* to the underlying claims in its determination of the fair value of Plaintiffs' shares. O.R.S. § 60.952(5)(a). But, as further argued below, the stay precluded litigation proceedings against Appellants on the merits, or adjudication of those claims to a judgment, which is why the judgment must be reversed.

## SUMMARY OF ARGUMENT

The intent of the purchase election, as stated by the Oregon Supreme Court, was to "discourage litigation between shareholders, with its potential for acrimony and harm to the firm and others, by providing an incentive for shareholders to resolve their disputes in some way other than a proceeding under subsection (1)." *Graydog*, 362 Or. at 198. The District Court's erroneous interpretation of the statute, and pressure on Appellants to "settle" the stayed claims or face harsh punitive remedies, did the opposite, i.e., it *incentivized* the Plaintiffs and other parties to try and convert the valuation process into a "proceeding under subsection (1)", and then flip the purchase election "remedy" on its head. The District Court's view that O.R.S. §

29

60.952(5) and O.R.S. § 60.952(6) gave it unfettered discretion to adjudicate stayed subsection (1) claims, within the election valuation process, was error. The Court's grant of fees to Plaintiffs on a "common fund" theory was error, as was the assessment of fees against Appellants.

## STANDARD OF REVIEW

The District Court's interpretation of a state statute—here O.R.S. § 60.952(5) and O.R.S. § 60.952(6)—is reviewed *de novo* by this Court. *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1080 (9th Cir.), *cert. denied*, 136 S. Ct. 410 (2015). "In interpreting state law, federal courts are bound by the pronouncements of the state's highest court." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1203 (9th Cir. 2002). Oregon's highest court interpreted O.R.S. § 60.952 in *Graydog Internet, Inc.*, 362 Or. at 180-82, 406 P.3d at 48.

## ARGUMENT

**A. The District Court misinterpreted O.R.S. § 60.952(6) to permit it to remedy Plaintiffs' underlying oppression claims under O.R.S. § 60.952(2) instead of completing the statutory election to purchase under O.R.S. § 60.952(5).**

The District Court erroneously entered a judgment – following an election to purchase the Plaintiffs' shares – that "extinguished" Appellants' shares in HEI, to "remedy" the underlying claims between Appellants and HEI. That judgment/decree was issued without a trial, or due process on the underlying claims, while those claims were "stayed" by O.R.S. § 60.952(6)(f), and the stay was never lifted.

30

This Court had already held that the O.R.S. § 60.952(6) provided a path "to shortcut litigation by purchasing the plaintiff's shares for fair value." *Scallon*, 686 F. App'x at 495. "[T]he legislature wanted the provision [O.R.S. § 60.952(6)] to be used to end costly litigation early." *Scallon*, 686 F. App'x at 496. The District Court ignored that direction, and after years of delay, simply did whatever it wanted.

1. **O.R.S. § 60.952(2) provides broad equitable authority to resolve oppression claims identified in O.R.S. § 60.952(1).**

Appellants do not dispute that O.R.S. § 60.952(2), (3) and (4) provide broad equitable remedies to resolve subsection (1) oppression claims *in the absence of an election to purchase*. That statutory authority in O.R.S. § 60.952(2) was described in *Graydog* as offering common law remedies and additional remedies "to shareholders who could establish liability under O.R.S. § 60.952(1)."

> "Today, state statutes provide alternative remedies to dissolution. Consistent with that trend, a 'principal change' contained in [O.R.S. § 60.952] was to specify additional remedies, beyond dissolution, that *would be available to shareholders who could establish liability under O.R.S. § 60.952(1)*." *Graydog*, 362 Or. at 194 (citations omitted) (emphasis added).

The *text* of O.R.S. § 60.952(2) says that it is a non-exclusive list of "[t]he remedies *that the court may order in a proceeding under subsection (1)* of this section * * *." (emphasis added). The legislature clearly intended subsection (2) remedies to "be available" to *adjudicated* subsection (1) claims, i.e., to "shareholders who could establish liability under O.R.S. § 60.952(1)." *Graydog*, at 194.

31

**2. O.R.S. § 60.952(6) provides a legislative alternative to litigating oppression claims, in the form of a purchase election.**

As explained by the Oregon Supreme Court in *Graydog*, O.R.S. § 60.952(6) was intended to provide a beneficial "shortcut" to avoid protracted litigation of shareholder oppression claims filed under O.R.S. § 60.952(1).

> "*The Oregon and MBCA election statutes share the purposes of providing an incentive for shareholders to resolve their disputes without resorting to a 'proceeding under subsection (1)' and providing a shortcut to a remedy when litigation does arise. Reducing litigation between shareholders in close corporations is desirable policy because it protects the firm, its employees, and other stakeholders from the consequences of extended litigation.* Steve Naito, testifying in support of SB 116, spoke about the costs, monetary and otherwise, associated with litigating disputes between shareholders in a close corporation:
>
> > "'[T]hey are extremely expensive cases to litigate. They take a substantial amount of time and money. And again because it involves a lot of interpersonal issues it becomes just like a personal divorce—a marital divorce. It raises a lot of issues that no one ever wants to raise, especially in a court of law and it effectively— or in many cases it effectively— destroys the relationship of the parties going forward.'
>
> "The election provision in O.R.S. § 60.952(6) provides a means of lessening the costs, including those related to interpersonal disputes, associated with a litigated resolution to a shareholder dispute." *Graydog*, 362 Or at 195-197 (citations omitted) (emphasis added).

HEI argued this *correct* view of the statute in the *Scallon I* appeal and is judicially estopped[9] from arguing differently in this appeal. HEI clearly argued in

---

[9] Judicial estoppel is a "common law equitable principle" whose purpose is "to protect the judiciary, as an institution, from the perversion of judicial machinery." *Hampton Tree Farms v. Jewett*, 320 Or. 599, 609, 892 P.2d 683 (1995). The U.S. Supreme Court endorsed its application in *New Hampshire v. Maine*, 532 U.S. 742,

32

*Scallon I* that, on remand, the underlying claims would not be "adjudicated" but would instead be "valued." They would not, therefore, require "full blown litigation." See supra, at 7-9. Defendants Kearney, Henry and Kruse correctly argued in 2015 that O.R.S. § 60.952(6) served as a legislative "escape route" from "the economic and social cost of protracted shareholder litigation." 3-ER-380.[10] HEI successfully argued that the "valuation" process *replaced* and *terminated* the underlying subsection (1) claims, thus eliminating any violation of the constitutional right to jury. 3-ER-360, 363. HEI is estopped from arguing the opposite position, after its success in *Scallon I.*

3. **After an election, O.R.S. § 60.952(6)(f) allows a stay on all O.R.S. § 60.952(1) oppression claims, to determine the fair value and payment terms under O.R.S. § 60.952(5).**

O.R.S. § 60.952(6)(f) provides:

"If the parties are unable to reach an agreement as described in paragraph (e) of this subsection, the court, upon application of any

---

121 S. Ct. 1808 (2001). There, the Court stated the rule that "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." *Id.* at 749, 121 S. Ct. 1808 (internal quotations and citations omitted). *See also, Rissetto v. Plumbers & Steamfitters Local 343, 94* F.3d 597, 600-01 (9th Cir. 1996) (Party cannot take one position and later take an incompatible position).

[10] They argued, "When relationships among shareholders of privately held companies break down, litigation often results. Shareholder litigation, with its expense, distraction, and turmoil, is often a death knell. And the litigation may serve only to aggravate the dysfunction and antagonism between the owners, instead of freeing them to move on to other, more productive enterprises. Recognizing the economic and social cost of protracted shareholder litigation, the Legislature has provided an escape route: ORS 60.952(6)." 3-ER-380.

33

party, shall stay the proceeding under subsection (1) of this section and shall, under subsection (5) of this section, determine the fair value and terms of purchase of the shares of the shareholder who filed the proceeding as of the day before the date on which the proceeding was filed or as of such other date as the court deems appropriate under the circumstances." (emphasis added).

While O.R.S. § 60.952 does not define "stay," the term has a well-known legal meaning.  In contrast to an injunction, which applies to parties, a stay applies to courts and proceedings against a party.  *Andreiu v. Ashcroft*, 253 F.3d 477, 483 (9th Cir. 2001).  For over a hundred years, Oregon courts have defined the words "to stay" to apply to future action, meaning "to stop," "to arrest" or "to forbear."  *Gearin v. Fleckenstein*, 89 Or. 146, 140, 173 P. 569, 570 (1918).  *See also*, *WD Equip., L.L.C. v. Cowen* (*In re Cowen*), 849 F.3d 943, 949 (10th Cir. 2017) (citations omitted) ("Stay means stay, not go"). Clearly, the legislature intended to "stop" "arrest" "forbear" or "halt" the "proceeding under subsection (1)" while the purchase election could be completed under "subsection (5)."   Below, the District Court acknowledged the existence of the stay, 1-ER-57 ("the claims are stayed"), but then completely violated it.  1-ER-20 ("the only equitable outcome here is to incorporate Scott Henry's debt in the buyout * * * *.").

### 4. The legislature balanced the advantages and disadvantages of the purchase election, and provided an incentive for shareholders to resolve their disputes in some way other than a proceeding under subsection (1).

As held in *Graydog*, the legislature considered the pros and cons of a statutory election to purchase plaintiff's shares, and intended to "discourage" shareholder

34

litigation, and "incentivize" an alternative to litigation. After discussing problems associated with the forced sale of shares, the Court wrote:

> "The legislative history of O.R.S. § 60.952(6) shows that the legislature intended to discourage litigation between shareholders, with its potential for acrimony and harm to the firm and others, by providing an incentive for shareholders to resolve their disputes *in some way other than a 'proceeding under subsection (1).'* But it also recognized that the solution is imperfect because a shareholder's ownership stake may represent more than a solely financial investment, and a shareholder subject to a court-ordered sale of its shares for 'fair value' may be incompletely compensated for its loss." 362 Or. at 198.

Thus, the State's highest court believes that the purchase election was provided as an *alternative* to O.R.S. § 60.952(1) litigation, and not an *addition* to the acrimonious and harmful "proceeding under subsection (1)." *Graydog*, 362 Or at 198. Any interpretation of O.R.S. § 60.952(6) to provide a remedy in "addition" to, and not an "alternative" to, Section (1) oppression litigation, contradicts the settled intent of the legislature to provide a shortcut to *avoid* difficult oppression claims. This Court is bound by *Graydog's* interpretation. *Hemmings*, 285 F.3d at 1203.

*Graydog's* interpretation of the statute, was recently affirmed by this Court in *Powell v. Rasmussen*, No. 22-35361, No. 22-35362, 2023 U.S. App. LEXIS 23094, at *8 (9th Cir. Aug. 31, 2023) (unpublished), where it held:

> "Allowing resolution of [Plaintiff's] claims against [Defendant] via further litigation, rather than by including them in the valuation of the share purchase, may thus run contrary to the Oregon Supreme Court's admonition that the statute was designed to '[r]educ[e] litigation between shareholders' and 'provid[e] a shortcut to a remedy.' *See Graydog*, 406 P.3d at 56.

35

"* * * * As the Oregon Supreme Court stated in *Graydog*, when a shareholder files a proceeding under subsection (1) of O.R.S. Section 60.952, she 'in effect makes an offer to sell all of [her] shares, for fair value, to the corporation or another shareholder, without resolving the merits of the complaint . . . that [she] filed,' *Graydog*, 406 P.3d at 48 (emphasis added).

* * * [Plaintiff] *is no longer entitled to a resolution of the merits of her claims under subsection (1)*. Given [Defendant's] election to purchase [Plaintiff's] shares under O.R.S. Section 60.952(6), *the only thing [Plaintiff] is entitled to is the purchase of her shares, pursuant to the terms set by the court under O.R.S. Section 60.952(5)*. See O.R.S. § 60.952(6)(f)." (emphasis added).

5. **The legislature distinguished between the broad equitable powers provided to the court to resolve an oppression claim, and the narrower powers provided to determine a fair share value and enforce the purchase election.**

After an election to purchase a plaintiff's shares for fair value, if the parties cannot agree on "fair value," O.R.S. § 60.952(6)(f) directs the court to provide only *one* of the many O.R.S. § 60.952(2) remedies to the parties, namely, the determination of fair value and terms under O.R.S. § 60.952(5). That direction to determine values and complete the purchase "under subsection (5)" is mandatory. O.R.S. § 60.952(6)(f) provides,

"If the parties are unable to reach an agreement as described in paragraph (e) of this subsection, the court, upon application of any party, shall stay the proceeding under subsection (1) of this section and *shall, under subsection (5) of this section, determine the fair value and terms of purchase of the shares of the shareholder who filed the proceeding* as of the day before the date on which the proceeding was filed or as of such other date as the court deems appropriate under the circumstances."

O.R.S. § 60.952(5) gives the court narrow authority to accomplish the election.

36

It does not incorporate the long list of remedies in O.R.S. § 60.952(2), or express, as in O.R.S. § 60.952(2), (3) and (4) that other remedies are available. Instead, O.R.S. § 60.952(5) provides a court with narrow authority to determine the fair value of the shares, and to complete the elected purchase of the plaintiff's shares – even if the parties cannot agree on price or terms.

While some equitable powers are enumerated in O.R.S. § 60.952(5), each reference is related to a specific task. *See* O.R.S. § 60.952(5)(a)(C) (choosing an equitable interest rate); O.R.S. § 60.952(5)(a)(E) (retaining jurisdiction to enforce the elected purchase); O.R.S. § 60.952(5)(c) (modifying the terms of an order to purchase the Plaintiff's shares "if the court finds that the modifications are equitable."); O.R.S. § 60.952(5)(e) (preserving distribution and voting rights if the Plaintiff's shares are being purchased by more than one shareholder, "unless equity requires otherwise.").

None of the equitable powers enumerated in O.R.S. § 60.952(5) was ever triggered by the facts of this case or relied upon by the District Court in rendering its decisions. None of them purport to allow the court "unfettered equitable discretion" to craft any remedy it wants after an O.R.S. § 60.952(6) election, and after the subsection (1) claims have been stayed.

37

**6. O.R.S. § 60.952(6)(d) does not confer unfettered authority to resolve an O.R.S. § 60.952(6) election with O.R.S. § 60.952(2) remedies.**

Plaintiffs' argument to the District Court, that O.R.S. § 60.952(6)(d) imposed an *obligation* to adjudicate underlying subsection (1) claims during a subsection (6) purchase election, contradicted *Graydog's* interpretation of O.R.S. § 60.952(6) to provide "some other way" to resolve the underlying dispute.

The text of O.R.S. § 60.952(6)(d) demonstrates that its purpose is not to add vexatious litigation to a purchase election, but to require review of out of court settlements that do not follow a statutory process. The provision states:

> "After an election to purchase has been filed by the corporation or one or more shareholders, the proceeding filed under subsection (1) of this section may not be discontinued or settled, nor may the shareholder who filed the proceeding sell or otherwise dispose of the shareholder's shares, unless the court determines that it would be equitable to the corporation and the shareholders, other than the petitioner, to permit the discontinuance, settlement, sale or other disposition. In considering whether equity exists to approve any settlement, the court may take into consideration the reasonable expectations of the shareholders as referred to in subsection (4) of this section, including any existing agreement among the shareholders."

The first sentence states that O.R.S. § 60.952(6)(d) applies only *after* an O.R.S. § 60.952(6) election has been filed. Other provisions are also triggered by an election to purchase under O.R.S. § 60.952(6). O.R.S. § 60.952(6)(e) allows the participants in the "latest election to purchase", the opportunity to agree with the Plaintiffs as to the fair value price, and payment terms. If they can do that within 30 days, the court "*shall* enter an order directing the purchase of shares upon the terms

38

and conditions agreed to by the parties." Therefore, if the appropriate parties can agree within the statutory periods set forth in O.R.S. § 60.952(6)(e), the order "shall" be entered, and there is no review for fairness to other shareholders. If the parties can't agree, O.R.S. § 60.952(6)(f) specifies that any party may stay the underlying proceedings, and the parties must follow the process set forth in O.R.S. § 60.952(5). There, the court is charged to determine the fair value, consider financial or legal restraints of the purchaser, specify the terms of purchase and require the seller to deliver the shares. O.R.S. § 60.952(5)(a). There would be no reason to further "review" the Court's price and terms for "fairness" after the Court *determines* the price and terms under O.R.S. § 60.952(5)(a).

Therefore, O.R.S. § 60.952(6)(d) provides for the review of settlements or dismissals of underlying claims that occur *after* an election, but *before* the court determines "fair value" and terms under O.R.S. § 60.952(5). Furthermore, the power granted in O.R.S. § 60.952(6)(d) is, by its own text, limited to *review*, and *approval*, of submitted settlements or dismissals *after* an election and stay are in place. Subsection (6)(d) does not, for example, give the Court the power to impose a more "equitable" settlement on the parties than what is submitted for approval. If the Court determines a proposed settlement is inequitable, its "power" is to deny approval of the settlement, and to continue with the purchase election process under O.R.S. § 60.952(5).

To read subsection (6)(d), as Plaintiffs have proposed, to provide the Court

39

with an "obligation" to adjudicate the underlying subsection (1) claims, even after an election, contradicts the stay imposed by O.R.S. § 60.952(6)(f). The "stay" on subsection (1) claims is inconsistent with any argument that the Court had an "obligation" to adjudicate the same claims.

### 7. The O.R.S. § 60.952(6) "shortcut" is the law of this case.

The *Graydog* interpretation of O.R.S. § 60.952(6), as providing a "short cut" to oppression litigation, is also the law of the case.[11] The Ninth Circuit's holdings in *Scallon I* were narrow, but important. In *Scallon I*, this Court held that O.R.S. § 60.952(6) applied to the shareholder derivative action filed against Appellants and others. It held that O.R.S. § 60.952(6) allowed a company accused of wrongful conduct by a shareholder to "shortcut" that litigation through a statutory purchase election. It held (consistently with *Graydog*) that "the legislature wanted the provision [O.R.S. § 60.952(6)] to be used to end costly litigation early." And, by

---

[11]  The law-of-the-case doctrine generally provides that "'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Musacchio v. United States*, 136 S. Ct. 709, 716, 193 L. Ed. 2d 639 (2016). The doctrine applies to "issues decided explicitly or by necessary implication in this court's previous disposition." *Hanna Boys Center v. Miller*, 853 F.2d 682, 686 (9th Cir. 1988)

> "The doctrine applies most clearly where an issue has been decided by a higher court; in that case, the lower court is precluded from reconsidering the issue and abuses its discretion in doing so except in the limited circumstances the district court identified." *Askins v. United States Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018).

necessary implication, it held that there was no violation of the constitutional "right to jury trial." *Scallon*, 686 F. App'x at 495-96.

Because these holdings are the law of the case, Plaintiffs (and the District Court) had no business re-interpreting the statute to allow the Court to impose any section (2) remedy in a purchase election proceeding, or to allow the adjudication of section (1) claims after a stay of those claims was in place. The District Court erroneously changed this Court's "short cut" (law of the case) into protracted litigation of the underlying oppression claims.

## B. The District Court erred by punishing Appellants for not settling stayed claims, through the assessment of damages and attorney fees.

### 1. It was error to punish Appellants for not resolving stayed claims.

If the adjudication of a matter is "stayed" and a court is prevented from adjudicating the matter, that court must also be prevented from penalizing a party for not "volunteering" to resolve the stayed matter to the satisfaction of the court or other parties. *See Kirkland v. Legion Ins. Co.*, 343 F.3d 1135, 1142 (9th Cir. 2003) ("The validity of a contempt adjudication is based on the legitimacy of the underlying order.") If entering an order or judgment to pay a claim is an abuse of the court's jurisdiction or authority, then ordering a party to pay fees for its failure to pay the claim on its own, should not stand. *Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1394 (9th Cir. 1991) (contempt order cannot stand).

Here, the District Court failed to follow the statute (and law of the case) and

41

shortcut the litigation. Instead, it prolonged the purchase election to encourage settlement. When a global settlement didn't result, the Court should have timely completed the purchase election, and ended the vexatious litigation, as the legislature intended. Instead, the Court wrongly blamed the delay on Appellants' refusal to "settle up" and sanctioned Appellants with extraordinary remedies and fees for "prolonging the litigation."

Settlement is a voluntary thing. And while beneficial, it sometimes isn't possible for reasons a judge will never know, which is especially true in a family business with familial grievances unrelated to the business. All parties must agree to settle a matter. This case would have required agreement of at least nine named parties, and the Court under O.R.S. § 60.952(6)(d), to settle. The parties often had completely divergent interests, which they often chose not to disclose. As the Oregon Supreme Court pointed out in *Graydog,*

> "[Shareholder oppression cases] are extremely expensive cases to litigate. They take a substantial amount of time and money. And again because it involves a lot of interpersonal issues it becomes just like a personal divorce—a marital divorce. It raises a lot of issues that no one ever wants to raise, especially in a court of law and it effectively— or in many cases it effectively—destroys the relationship of the parties going forward." 362 Or. at 196.

It was error for the Court to "extinguish" Scott Henry's and Syndi Beavers' shares in HEI, because the parties couldn't settle all claims. The statute does not allow such action by the Court in the context of the O.R.S. § 60.952(5) purchase election process. It was error for the Court to allow settlement discussions –

42

pertaining to collateral claims not actively before the court – to influence (much less drive) the Court's decisions in the fair value proceeding before it.

**2. Fees were not available to anyone under the statute, or complaint.**

O.R.S. § 60.952 does not provide for prevailing party fees. Under subsection (1) and (2), the court may have had authority to award fees, in equity. But in the "shortcut" purchase election, the Court's authority was limited to determining the fair value and terms of purchase.

No claim or right to attorney fees was ever alleged against Appellants. 3-ER-395 (First Amended Complaint). Plaintiffs only alleged a claim against HEI for fees, based on a theory of "providing a benefit to the corporation" by prosecuting a derivative claim. 3-ER-408. That claim was stayed by the election, but the Court erroneously awarded fees against HEI and in favor of Plaintiffs on a common fund theory. 2-ER-211 (Plaintiffs' fee petition). Plaintiffs' judgment for "common fund" attorney fees should now be reversed along with the judgment against Appellants. Given the erroneous interpretations of O.R.S. § 60.952(6), urged by Plaintiffs, Plaintiffs' award of $424,421 in "common fund" fees must be reversed. 1-ER-7.

**3. The Court's Sanction under *Lu* was error.**

The Court based its assessment of fees against the Appellants on the inherent power of federal courts to "manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Lind v. Wabash R. Co.*, 370 U.S. 626, 630-631, 82 S. Ct. 1386 (1962). Under the Court's inherent authority, "one permissible sanction

43

is an assessment of attorney's fees, * * * instructing a party that has acted in bad faith to reimburse legal fees and costs incurred by the other side." *Goodyear*, 581 U.S. at 107 (internal quotation marks omitted). Such sanctions against a bad actor are limited to the legal fees the innocent party would not have incurred "but for" the misconduct. *Id*. 581 U.S. at 104, 108. Such an award is intended to be compensatory, not punitive. *Id*. at 108-09. This "granular inquiry" requires a court to evaluate the close causal link between the misconduct and the "individual expense items or categories of such items." *Lu v. United States*, 921 F.3d 850, 862 (9th Cir. 2019). In "exceptional cases" in which the bad faith litigation activity can be traced to the start of the entire litigation, a court may award fees "in one fell swoop" without having to trace each legal fee to a specific bad act during the litigation. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 51, 111 S. Ct. 2123, 2132-34 (1991); *Lu*, 921 F.3d at 863. To make a blanket award, in an exceptional case, the court must "explain why the entirety of the case, or some portion of the case, was initiated in 'complete bad faith.'" *Lu*, 921 F.3d at 863.

That wasn't done here. In the award below, the District Court failed to identify what litigation Appellants had initiated in bad faith to deserve the blanket assessment of fees. After all, they did not initiate any of the claims. They did not initiate the purchase election or move to stay the claims. But even if they had, the right to the election was affirmed by this Court in *Scallon I*. Surely following the statutory "escape route" (as Defendants Kearney, Henry and Kruse called it at 3-ER-

380), could not be sanctionable "bad faith" conduct. Appellants did not obstruct the statutory purchase process. They objected to the misuse of that process to litigate the underlying claims. Appellants did object to the misuse of the purchase election process, but parties are required to speak up when they believe the court is making an error. That is not a sanctionable abuse of the process.

Nevertheless, the District Court assessed Appellants with an "exceptional case" award of fees because, "'literally everything the defendant did—'his entire course of conduct throughout,'" and indeed preceding, the litigation—was 'part of a sordid scheme' to defeat a valid claim'. *Lu v. United States*, 921 F.3d 850, 860 (9th Cir. 2019) (*quoting O* (cleaned up)." 1-ER-11. The record does not support such a finding. Appellants were side-tracked parties to "stayed" claims. They were not even parties to the first appeal, or to the purchase election.

Appellants' actions were entirely consistent with the procedural posture of the claims against them after remand. The claims against them were "stayed," and so was all discovery on those claims. Appellants did not need to avoid those claims, because the election statute was designed to avoid them. In other words, if Appellants were "part of a sordid scheme to defeat a valid claim," then O.R.S. § 60.952(6) was the sordid scheme, and the Oregon legislature was its mastermind.

The District Court apparently does not agree with the legislative election remedy provided by O.R.S. § 60.952(6). It has failed to follow that statute twice – each time requiring an expensive appeal to this Ninth Circuit Court. But O.R.S. §

45

60.952(5) and O.R.S. § 60.952(6) exist, and Appellants should not be assessed "exceptional case bad faith" fees for merely following HEI's election.

The record below reflects that Appellants did not "abuse," "derail" or "delay" the purchase election process on remand or cause it to be more costly. The process derailed on account of the Plaintiffs' and the District Court's misplaced interpretations of the statute, and the District Court's unwillingness to complete the statutory purchase election remedy. Instead, the District Court prolonged the fair value proceeding to coerce a global settlement of complex stayed family business disputes, among dysfunctional family members. Appellants participated in those negotiations in good faith, but a global agreement couldn't be reached. The Court ultimately gave Plaintiffs what they wanted: judgment on the underlying claims, without a trial, and an "ultimate remedy" against the parties to the stayed claims. *Those decisions* resulted in prolonged and expensive litigation – which was exactly what the legislature intended to avoid by the purchase election process.

**C. This Court should require reassignment of this case on remand.**

Appellants seek reassignment of the case on remand. Under 28 U.S.C. § 2106, remand to a different district judge is appropriate if there is a demonstration of personal bias or unusual circumstances. In determining whether unusual circumstances exist the Ninth Circuit considers:

> "(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or

46

based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

"The first two factors are considered to be of equal importance; moreover, a finding of either one would support remand to a different judge." *United Nat'l Ins. Co. v. R & D Latex Corp., 14*1 F.3d 916, 920 (9th Cir. 1998) (*quoting California v. Montrose Chem. Corp.*, 104 F.3d 1507, 1521 (9th Cir. 1997)).

Here, the record supports that the assigned District Court judge "cannot reasonably be expected upon remand to disregard his previously expressed views in this matter." *United Nat'l Ins. Co.*, 141 F.3d at 919-20. He has twice erroneously interpreted O.R.S. § 60.952(6) to avoid the statutory "fair value" purchase elected by HEI in March, 2015. He has delayed the fair value purchase process by almost nine years, while encouraging a settlement of all claims. When no settlement could be reached, he blamed Appellants without considering the evidence to the contrary. He invited all parties to provide "ultimate remedies" to resolve the case. He then rejected his final obligation under O.R.S. § 60.952(5) (to decide payment terms and order the sale), and instead "remedied" the stayed claims with orders and judgments beyond the statutory construct of O.R.S. § 60.952(5) and O.R.S. § 60.952(6). When challenged, the sitting judge has dismissed Appellants' arguments as to the stay ("the current motion to stay looks to be simply the latest attempt by the [Appellants] to avoid settling up their debt") and has steadfastly claimed to use "vast equitable powers" placed in his hands by the legislature. 1-ER-7. Finally, with respect to

47

attorney fees, he rendered collateral "findings" that impugned Appellants with the *intent and motive* to increase the cost of litigation for everyone by failing to *settle* the stayed claims. The District Court's "findings" that "literally everything the defendant did" – "his entire course of conduct" preceding and through the litigation – "was part of a sordid scheme to defeat a valid claim," 1-ER-11, reveals a bias that is so severe, that the "judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind" those previously expressed views. *United Nat'l Ins. Co.*, 141 F.3d at 920. *See also*, 1-ER-39 (findings after "valuation" hearing); 1-ER-18 (opinion on remedies); 1-ER-55 (prehearing order).

In *Rhoades v. Avon Prods.*, 504 F.3d 1151, 1165-66 (9th Cir. 2007), a reassignment case, the trial court judge had granted defendant's motion to dismiss without allowing plaintiff's counsel the opportunity to respond, even briefly. The Ninth Circuit found that the trial judge's rulings were "legally erroneous." *Id*. 504 F.3d at 1166.

Here, the assigned trial judge erroneously interpreted the statute to avoid the purchase election, blamed nine years of litigation on Appellants, who were only nominal parties to stayed claims, and then charged them with intentionally driving up legal costs for everyone so that they could better avoid their debts. 1-ER-21. The trial judge excluded Appellants from presenting their own records of attorneys fees, and did not invite any response from Appellants or *evidence* from Plaintiffs on any of the other requests for fees. 1-ER-16. When Appellants submitted evidence without

invitation, he rebuffed Appellants for rehashing "stale" arguments without further consideration. 1-ER-11. The substantial extra-judicial findings in this case against Appellants, exceed those in *Rhoades*, where this Court concluded that "if this case were before him, [the judge] would have substantial difficulty in putting his previously expressed views out of his mind." 504 F.3d at 1166.

Reassignment is equally necessary to preserve the appearance of justice. *United Nat'l Ins. Co.*, 141 F.3d at 920. Having twice denied the application of the "fair value purchase election" set out in O.R.S. § 60.952(6) and O.R.S. § 60.952(5), by erroneous interpretations of the statute, the only action by the District Court on remand that "will preserve the appearance of justice" is to complete the purchase by HEI of Plaintiffs' shares for the determined price. The current judge has demonstrated that he is unwilling to do so absent settlement of the underlying claims to everyone else's satisfaction. He has already caused the need for two expensive appeals. As the current judge is currently sitting as the chief judge of the district, any new judge should be assigned at random by the court clerk, and not by the sitting judge.

Finally, reassignment of this case on remand would not cause waste and duplication out of proportion to any gain in preserving the appearance of fairness, *United Nat'l Ins. Co.*, 141 F.3d at 920, because the purchase option is nearly completed. The value of Plaintiffs' shares has been determined. The terms of the purchase should be easy to decide. The record below documents that, in February of

49

2023, HEI held over $11 million in real property assets, had less than $13,000 in debt, and had almost $1 million dollars in the bank. 2-ER-128, 223-240. HEI can afford to purchase Plaintiffs' shares for the determined price. It may need to sell property, or continue logging, to raise the purchase price of Plaintiffs' shares, but the purchase could be completed within two or three years. All the Court needs to do on remand is to determine a fair down payment and terms, and order the sale.

## CONCLUSION

The legislature enacted the O.R.S. § 60.952(6) election to provide a way to avoid this kind of protracted litigation. The District Court's failure to respect the law of the case and the "shortcut" process described in O.R.S. § 60.952(6) and O.R.S. § 60.952(5) allowed Plaintiffs to reintroduce the merits of the stayed oppression claims into a meandering purchase election process. As Scott Henry's health deteriorated, and HEI changed its legal positions, the District Court erred by taking sides on the stayed underlying claims and by exerting pressure on Appellants to settle with all other parties, or suffer his extra-judicial remedies. Encouraged by the District Court's supportive (but misplaced) findings, the other parties to the litigation urged the Court to grant remedies and fee sanctions beyond its statutory authority.

/ / / /

/ / / /

/ / / /

/ / / /

50

Appellants seek to reverse the erroneous findings, orders, and judgment below, and to remand the case to specifically *complete* the O.R.S. § 60.952(6) purchase election, after reassignment on remand.

Dated June 13, 2024

Respectfully submitted,

ELLIOTT OSTRANDER & PRESTON, P.C

_____/s/ William A. Drew_____
William A. Drew, OSB No. 952539
Of Attorneys for Scott Henry's Winery Corp., Calvin
Henry, III, And Synthia Beavers -Appellants

## CERTIFICATE OF RELATED CASES

Pursuant to 9th Cir. R. 28.26, I state that there are no related cases to this appeal.

DATED this 13th day of June, 2024,


_____/s/ William A. Drew_____
William A. Drew, OSB No. 952539
Of Attorneys for Scott Henry's Winery Corp., Calvin
Henry, III, And Synthia Beavers -Appellants

## BRIEF FORMAT CERTIFICATION

Pursuant to 9th Cir. R. 32(e)(4), I certify that the Opening Brief is proportionately spaced, has a typeface of 14 points or more and contains 13,879 words.

DATED this 13th day of June, 2024,


_____/s/ William A. Drew_____
William A. Drew, OSB No. 952539
Of Attorneys for Scott Henry's Winery Corp., Calvin Henry, III, And Synthia Beavers -Appellant

# ADDENDUM

## O.R.S. § 60.952

Remedies for shareholders of close corporation.

(1)    In a proceeding by a shareholder in a corporation that does not have shares that are listed on a national securities exchange or that are regularly traded in a market maintained by one or more members of a national or affiliated securities association, the circuit court may order one or more of the remedies listed in subsection (2) of this section if it is established that:

(a)    The directors are deadlocked in the management of the corporate affairs, the shareholders are unable to break the deadlock and irreparable injury to the corporation is threatened or being suffered, or the business and affairs of the corporation can no longer be conducted to the advantage of the shareholders generally, because of the deadlock;

(b)    The directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal, oppressive or fraudulent;

(c)    The shareholders are deadlocked in voting power and have failed, for a period that includes at least two consecutive annual meeting dates, to elect successors to directors whose terms have expired; or

(d)    The corporate assets are being misapplied or wasted.

(2)    The remedies that the court may order in a proceeding under subsection

(1) of this section include but are not limited to the following:

(a)    The performance, prohibition, alteration or setting aside of any

action of the corporation or of its shareholders, directors or officers or any other

party to the proceeding;

(b)    The cancellation or alteration of any provision in the

corporation's articles of incorporation or bylaws;

(c)    The removal from office of any director or officer;

(d)    The appointment of any individual as a director or officer;

(e)    An accounting with respect to any matter in dispute;

(f)    The appointment of a custodian to manage the business and affairs

of the corporation, to serve for the term and under the conditions prescribed by

the court;

(g)    The appointment of a provisional director to serve for the term

and under the conditions prescribed by the court;

(h)    The submission of the dispute to mediation or another form

of nonbinding alternative dispute resolution;

(i)    The issuance of distributions;

(j)    The award of damages to any aggrieved party;

(k)    The purchase by the corporation or one or more shareholders of all

of the shares of one or more other shareholders for their fair value and on the terms determined under subsection (5) of this section;

(L) The retention of jurisdiction of the case by the court for the protection of the shareholder who filed the proceeding; or

(m) The dissolution of the corporation if the court determines that no remedy specified in paragraphs (a) to (L) of this subsection or other alternative remedy is sufficient to resolve the matters in dispute. In determining whether to dissolve the corporation, the court shall consider among other relevant evidence the financial condition of the corporation but may not refuse to dissolve the corporation solely because it has accumulated earnings or current operating profits.

(3) The remedies set forth in subsection (2) of this section shall not be exclusive of other legal and equitable remedies that the court may impose. Except as provided in this subsection, the shareholders of a corporation may, pursuant to an agreement described in O.R.S. § 60.265, agree to limit or eliminate any of the remedies set forth in subsection (2) of this section. The remedies set forth in subsection (2)(e), (j) and (m) of this section may not be eliminated.

(4) In determining the appropriate remedies to order under subsection (2) of this section, the court may take into consideration the reasonable expectations of

the corporation's shareholders as they existed at the time the corporation was formed and developed during the course of the shareholders' relationship with the corporation and with each other. The court shall endeavor to minimize the harm to the business of the corporation.

(5)    (a)    If the court orders a share purchase, the court shall:

(A)    Determine the fair value of the shares, with or without the assistance of appraisers, taking into account any impact on the value of the shares resulting from the actions giving rise to a proceeding under subsection (1) of this section;

(B)    Consider any financial or legal constraints on the ability of the corporation or the purchasing shareholder to purchase the shares;

(C)    Specify the terms of the purchase, including, if appropriate, terms for installment payments, interest at the rate and from the date determined by the court to be equitable, subordination of the purchase obligation to the rights of the corporation's other creditors, security for a deferred purchase price and a covenant not to compete or other restriction on the seller;

(D)    Require the seller to deliver all of the seller's shares to the purchaser upon receipt of the purchase price or the first installment of the purchase price; and

(E)    Retain jurisdiction to enforce the purchase order by,

among other remedies, ordering the corporation to be dissolved if the purchase is not completed in accordance with the terms of the purchase order.

(a)     The share purchase ordered under this subsection shall be consummated within 20 days after the date the order becomes final unless before that time the corporation files with the court a notice of its intention to dissolve and articles of dissolution are properly filed with the Secretary of State within 50 days after filing the notice with the court.

(b)     After the purchase order is entered and before the purchase price is fully paid, any party may petition the court to modify the terms of the purchase, and the court may do so if the court finds that the modifications are equitable.

(c)     Unless the purchase order is modified by the court, the selling shareholder shall have no further rights as a shareholder from the date the seller delivers all of the shareholder's shares to the purchaser or such other date specified by the court.

(d)     If the court orders shares to be purchased by one or more other shareholders, in allocating the shares to be purchased by the other shareholders, unless equity requires otherwise, the court shall attempt to preserve the existing distribution of voting rights and other designations, preferences, qualifications,

limitations, restrictions and special or relative rights among the holders of the class or classes of shares and may direct that holders of a specific class or classes not participate in the purchase.

(6)    At any time within 90 days after the filing of a proceeding under subsection (1) of this section, or at such time determined by the court to be equitable, the corporation or one or more shareholders may elect to purchase all of the shares owned by the shareholder who filed the proceeding for their fair value. An election to purchase under this subsection shall state in writing the amount that the electing party will pay for the shares. The following apply:

(a)    The election to purchase shall be irrevocable unless the court determines that it is equitable to set aside or modify the election.

(b)    If the election to purchase is filed by one or more shareholders, the corporation shall, within 10 days thereafter, give written notice to all shareholders. The notice shall state the name of the shareholder who filed the proceeding under subsection (1) of this section and the number of shares owned by that shareholder, the name of each electing shareholder and the number of shares owned by that electing shareholder and the amount that each electing shareholder will pay for the shares. The notice also must advise the recipients of their right to join in the election to purchase shares. Shareholders who wish to participate must file notice of their intention to join in the election to purchase

not later than 30 days after the date of the notice to them or at such time as the court in its discretion may allow. All shareholders who have filed an election or notice of their intention to participate in the election to purchase thereby become parties to the proceeding under subsection (1) of this section and shall participate in the purchase in proportion to their ownership of shares as of the date the first election was filed, unless the shareholders otherwise agree or the court otherwise directs.

(c)     The court in its discretion may allow the corporation and shareholders to file an election to purchase the shares of the shareholder who filed the proceeding under subsection (1) of this section at a price higher than the amount previously offered. If the court does so, it shall allow other shareholders an opportunity to join in the election to purchase at the higher price in accordance with their proportionate ownership interest.

(d)     After an election to purchase has been filed by the corporation or one or more shareholders, the proceeding filed under subsection (1) of this section may not be discontinued or settled, nor may the shareholder who filed the proceeding sell or otherwise dispose of the shareholder's shares, unless the court determines that it would be equitable to the corporation and the shareholders, other than the petitioner, to permit the discontinuance, settlement, sale or other disposition. In considering whether equity exists to approve any

settlement, the court may take into consideration the reasonable expectations of the shareholders as referred to in subsection (4) of this section, including any existing agreement among the shareholders.

(e)     If, within 30 days of the filing of the latest election to purchase allowed by the court, the parties reach agreement as to the fair value and terms of purchase of the shares of the shareholder who filed the proceeding under subsection (1) of this section, the court shall enter an order directing the purchase of shares upon the terms and conditions agreed to by the parties.

(f)     If the parties are unable to reach an agreement as described in paragraph (e) of this subsection, the court, upon application of any party, shall stay the proceeding under subsection (1) of this section and shall, under subsection (5) of this section, determine the fair value and terms of purchase of the shares of the shareholder who filed the proceeding as of the day before the date on which the proceeding was filed or as of such other date as the court deems appropriate under the circumstances.

(7)     In any proceeding under subsection (1) of this section, the court shall allow reasonable compensation to the custodian, provisional director, appraiser or other such person appointed by the court for services rendered and reimbursement or direct payment of reasonable costs and expenses. Amounts described in this subsection shall be paid by the corporation.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 13, 2024

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

                                 /s/ William A. Drew
                              William A. Drew, OSB No. 952539
                              Of Attorneys for Appellants